**D.E. & J LIMITED PARTNERSHIP, Individually and on behalf of all others similarly situated, Plaintiff,**

v.

**Charles CONAWAY, Jeffrey Boyer, Mark S. Schwartz, Matthew F. Hilzinger, Martin E. Welch, and PricewaterhouseCoopers, LLP, Defendants.**

No. 02–CV–70684–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 19, 2003.

Sanford Dumain, Brian C. Kerr, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, On behalf of the Plaintiffs.

Katharine M. Ryan, Schiffrin & Barroway, LLP, Bala Cynwd, PA, On behalf of the Plaintiffs.

E. Powell Miller, Miller Shea, P.C., Troy, MI, On behalf of the Plaintiffs.

Scott R. Lassar, Hille R. Sheppard, Sidley, Austin, Chicago, IL, On behalf of Defendant Conaway.

David H. Kistenbroker, Katten Muchin Zavis, Chicago, IL, On behalf of the Defendants Hilzinger and Welch.

Martin L. Perschetz, Matthew L. Craner, Schulte Roth & Zabel LLP, New York, NY, On behalf of Defendant Boyer.

Brian Rosner, Law Office of Brian Rosner, New York, NY, On behalf of Defendant Schwartz.

Eric H. Lipsitt, Williams Mullen, Detroit, MI, On behalf of Defendant Schwartz.

James J. Boland, Kirkland & Ellis LLP, Chicago, IL, On behalf of PricewaterhouseCoopers.

Tom Tallerico, Bodman, Longley & Dahling, LLP, Troy, MI, On behalf of PricewaterhouseCoopers.

Philip T. Carter, Patrick McCarthy, Howard & Howard, Bloomfield Hills, MI, On behalf of Kmart Corporation, Intervenors.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS

ROSEN, District Judge.

### I. INTRODUCTION

The above-captioned securities fraud action is a consolidation of several complaints[1] filed as putative class actions

---

1. On August 22, 2002, the Court entered an Order consolidating five separately filed

against five senior executive officers (the "Individual Defendants") of Kmart Corporation and Kmart's outside auditiors, PricewaterhouseCoopers LLP. The case is presently before the Court on five separate Motions to Dismiss filed by the Defendants as their initial responsive pleadings. Plaintiffs have responded to the Defendants' Motions to which response Defendants have replied. The Court also ordered supplemental briefing following the hearing held on this matter on July 10, 2003 and the parties filed Supplemental Briefs in accordance therewith. Having reviewed and considered the parties' briefs and the applicable law, and having heard the oral arguments of counsel on July 10, 2003, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. FACTUAL BACKGROUND

### PROCEDURAL HISTORY

On February 21, 2002, D.E. & J Limited Partnership initiated this securities fraud action on behalf of a class consisting of persons and entities who purchased securities of Kmart Corporation between March 13, 2001 and May 15, 2002.[2] In accordance with the Private Securities Litigation Re-

cases: *D.E. & J Limited Partnership v. Conaway*, No. 02–70684; *Chiu v. Conaway*, No. 02–70841; *Frost v. Conaway*, No. 02–70842; *Al–Hasan v. Conaway*, No. 02–70886; and *Hsu v. Conaway*, No. 02–71554.

2. D.E. and J's original complaint had indicated a "class period" from May 17, 2001 through January 22, 2002. This period was expanded in Plaintiffs' subsequently filed Consolidated Complaint.

3. The intervening parties included shareholders Ascend Capital, L.L.C., Ronald and Kathleen Bergh, Frederick Dominikus; Ralph Koerber; and Seyed Majid Mir–Moghtadei, and bondholders Friends of the Ariel Center for Policy Research and Gerald F. Johannes.

4. *See* note 1, *supra*.

form Act, 15 U.S.C. § 78u–4, *et seq.* (the "PSLRA"), D.E. & J subsequently published notice of the potential class action and pursuant thereto, within six months of the filing of D.E. & J's initial Complaint, a number of parties moved to intervene and requested to be named lead plaintiffs in the action.[3] Four additional separate complaints were also filed on behalf of several other Kmart shareholders and bondholders.[4] On August 22, 2002, the Court entered an Order consolidating the five separately-filed cases and directed the filing of an amended consolidated complaint. The parties thereafter stipulated to Plaintiffs' amendment of the Amended Consolidated Complaint and, pursuant to that stipulation, on November 1, 2002, Plaintiffs filed their "Corrected Consolidated Amended Complaint.".[5] In lieu of an answer, the various Defendants filed separate Motions to Dismiss. Pre-hearing briefing on Defendants' Motions continued through mid-June 2003.

### THE PARTIES

Proposed Lead Class Plaintiffs, Ascend Capital, LLC, Ronald and Kathleen Bergh, and Frederick Dominikus collectively purchased 1,149,400 shares of Kmart stock between May 17, 2001 and January 22, 2002 (the "Class Period") and suffered approximately $2,943,503.00 in losses.[6]

5. Unless otherwise specified, references in this Opinion and Order to Plaintiffs' Complaint or Plaintiffs' Consolidated Complaint refer to the Corrected Consolidated Amended Complaint.

6. The PSLRA presumes that the most adequate lead plaintiff in a private securities action is the person or group of persons that (a) has filed the complaint or made a motion [for appointment as lead plaintiff], (b) has the largest financial interest in the relief sought by the class, and (c) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u–4(a)(3)(B)(iii). All parties apparently agree that Ascend, the Berghs, and Mr. Dominikus (collectively referred to as the "Ascend parties") are the most appropriate lead plaintiffs in this case. No other plaintiff or intervening

Kmart is a discount retailer based in Troy, Michigan. Kmart stores are located in all 50 of the United States, Puerto Rico, the United States Virgin Islands and Guam. On January 22, 2002, Kmart announced that it had filed for Chapter 11 bankruptcy protection.

Defendant Charles Conaway served as Kmart's Chairman and Chief Executive Officer ("CEO") from May 2000 until his resignation in March 2002. Defendant Jeffrey Boyer served as the Company's Chief Financial Officer ("CFO") for approximately six months, from May 3, 2001 until November 9, 2001. Boyer was preceded by Defendant Martin Welch who served as the Company's CFO until his resignation in May 2001. (Prior to assuming the CFO position, Boyer served as an Executive Vice President of the Company.)

Defendant Mark Schwartz served as Kmart's President and Chief Operating Officer ("COO") from March 14, 2001 until November 9, 2001. Prior to that time, from September 2000 until March 2001, Schwartz served as Executive Vice–President, Store Operations. Defendant Matthew Hilzinger served as Kmart's Vice President and Controller until his resignation in July 2001. Defendants Conaway, Boyer, Welch, Schwartz and Hilzinger are referred to collectively herein as the "Individual Defendants."

Defendant PricewaterhouseCoopers LLP ("PwC") is a worldwide firm of certified public accountants, auditors and consultants that provides a variety of accounting, auditing and consulting services. PwC, through its Detroit office, served as Kmart's auditor and principal accounting firm prior to and throughout the Class Period.

## THE CONSOLIDATED COMPLAINT ALLEGATIONS OF FRAUD

Plaintiffs allege that from March 2001 to May 2002, Kmart and certain of its officers made a series of false or misleading public statements and press releases about the Company's financial performance. (*See* Compl., ¶¶ 47, 50–53, 56–58, 59–63, 66–72, 74.) Specifically, Plaintiffs allege throughout the Class Period, Kmart and the Individual Defendants represented through press releases that Kmart was experiencing a turnaround as it was improving its operations, maintaining and/or improving its gross margins and positioning the Company to better compete with Wal–Mart and Target.[7] Plaintiffs allege, however,

party has as great a financial interest in the relief sought as the Ascend parties. Intervening Plaintiff Seyed Majid Mir–Moghtadaei purchased 115,000 shares of stock during the Class Period and suffered $168,850 in losses. Ralph Koerber, another intervening plaintiff, purchased 27,225 shares of stock and suffered $102,450 in losses, D.E. & J, the plaintiff named in the caption, purchased 3000 shares of Kmart stock during the Class Period. Mary Chiu (Case No. 02–70841) purchased 3000 shares of stock on January 16, 2002 and sold the stock on January 23, 2002 at a cumulative loss of approximately $1,410.00. Cathy Frost (Case No. 02–70842) purchased 1100 shares of stock during the Class Period. Raid Al–Hasan (Case No. 02–70886) purchased 4000 shares of stock during the Class Period. Techang Hsu (Case No. 02–71554) purchased 1000 shares of stock during the Class Period. Bondholder Gerald Johannes suffered

$190,352.33 in losses from Kmart 7.76% bonds due on 7/1/02, and Bondholder Ariel Center suffered $58,062.50 in losses from Kmart 8⅜% bonds due on 12/01/04.

7. The alleged offending statements included press releases issued by Kmart on March 13, April 2, April 12, May 10, May 17, June 7, July 12, July 23, August 1, August 9, August 23, September 6, October 11, October 25, November 8, November 27, December 6, 2001. In essence, in these press releases, Defendant Conaway, who is quoted in the press releases, stated that Kmart was striving to improve and was making progress in its effort to transform the Company and its place among its competitors. (*See e.g.,* Defendant Conaway's Ex. 10.)

Plaintiffs also point to Kmart's March 21, May 17, August 23, November 27, 2001

that these representations failed to disclose the following "adverse factors" affecting Kmart during the this period of time:

1. *Vendor Rebates.* (Compl.¶¶ 33–35). Plaintiffs allege that prior to and throughout the Class Period, Kmart was utilizing an estimation process for the reporting of vendor rebates. Kmart reported vendor rebates as a reduction of expenses in its interim financial statements based on an estimated amount of sales that it expected to achieve by the end of the year. Kmart was recognizing these rebates without a written commitment from the vendor and prior to actually earning the rebate. Plaintiffs further allege that the Company was setting aggressive, unattainable sales forecasts and used these unattainable projections in making its rebate estimates, thereby causing the Company to recognize increased levels of rebates which it was not assured of receiving.

2. *Supply Chain Management Problems.* (Compl.¶¶ 36–41). Plaintiffs allege that Kmart was having problems tracking and monitoring its inventory and lacked the systems and internal controls to do so.

3. *Problematic Relationship with Vendors.* (Compl.¶¶ 42–43). Plaintiffs allege that both prior to and during the Class Period, Kmart was very aggressive in dealing with vendors, regularly charging them (which amounted to a deduction on an invoice of monies owed by Kmart) for even the slightest failure to comply with Kmart's delivery policies, which created the risk that vendors would curtail their business with the Company.

4. *Failure of the "Bluelight Always" Marketing Campaign.* (Compl.¶¶ 44–46). Kmart expanded its "Bluelight Special" marketing program to "Bluelight Always" in the summer of 2001 by cutting prices in an attempt to enable it to compete with Wal–Mart and Target. The strategy was unsuccessful as Wal–Mart and Target responded by cutting its own prices and Kmart was unable to respond accordingly. As a result, customer traffic did not increase and inventory began to build up. Further, the price cuts that Kmart implemented in connection with the campaign significantly decreased the Company's gross margins.

In addition to these alleged omissions, Plaintiffs claim that Kmart issued false and misleading financial statements during the Class Period. (*See* Compl., ¶¶ 48, 54, 64, 73, 100, 139). Specifically, Plaintiffs claim that Kmart's fiscal year 2000 annual, and fiscal year 2001 quarterly and annual financial statements were false or misleading in the following respects:

- Kmart estimated vendor rebates to be received at year-end and recorded those estimates during the interim periods, allegedly in violation of GAAP (Generally Accepted Accounting Principles).[8] (*See* Compl., ¶¶ 99–116).

Form 10–K and 10–Q filings with the SEC which were signed in various instances by Defendants Conaway, Boyer, Schwartz, and/or Hilzinger, which stated that the financial statements contained in the filings had been prepared in accordance with generally accepted accounting principles and the rules and regulations of the SEC and in the opinion of management, reflect all adjustments necessary for a fair statement of the results for the periods they covered, and on that basis, reasonably presented the Company's financial position and results of operations. (*See* Compl., ¶¶ 48, 54, 64, 73.)

8. Generally Accepted Accounting Principles "are the conventions, rules and procedures that constitute the professional standards of the accounting profession." *In re: Comshare, Incorporated Securities Litigation,* 183 F.3d 542, 546 n. 4 (6th Cir.1999), (quoting *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1304 (C.D.Cal.1996)).

Plaintiffs allege that this practice impacted on Kmart's interim (quarterly) financial statements (but not its annual financial statements).

- The Company allegedly failed to disclose Kmart's policy of estimating and recording vendor rebates during interim periods, and misrepresented the reason for Kmart's change in this policy in the fourth fiscal quarter of 2001, which impacted on the Company's 2001 annual financial statements. (Compl., ¶¶ 117–122).

- Kmart allegedly failed to disclose certain retention loans made to key Kmart executives during 2001. (Compl., ¶¶ 123–25).

- The Company failed to write down inventory. (Compl., ¶¶ 126–34).

- Kmart failed to record a $167 million loss contingency in the second quarter of 2001, impacting on the Company's interim financial statements for the second fiscal quarter 2001. (Compl., ¶ 139.)

Plaintiffs allege that, because of the Individual Defendants' positions within the Company, they had access to the adverse undisclosed information about Kmart's business, and that as officers and controlling persons of a publicly-held company whose common stock was and is registered with the SEC, was traded on the New York Stock Exchange, and is governed by federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, and to correct any previously-issued statements that had become misleading or untrue.

Plaintiffs further allege that because of their Board membership and/or executive and managerial positions with Kmart, the Individual Defendants necessarily participated in the drafting, preparation and/or approval of the complained of press releases and reports, and were aware of, or recklessly disregarded, the misstatements and omissions therein, and were aware of their materially false and misleading nature.

Plaintiffs also allege that PwC was required to audit Kmart's financial statements in accordance with Generally Accepting Auditing Standards, and that with knowledge of Kmart's true financial condition and grossly inadequate financial controls, or in reckless disregard thereof, PwC certified the false and misleading financial statements of Kmart and provided an unqualified Independent Auditor's Report on those financial statements which were included in various of the Company's SEC filings and public disseminations.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO DEFENDANTS' MOTIONS TO DISMISS

In their Corrected Consolidated Amended Complaint, Plaintiffs allege two substantive claims. In their First Claim, Plaintiffs charge that the Defendants (collectively) violated § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. In their Second Claim, Plaintiffs allege that Defendants are liable pursuant to § 20(a) of the Exchange Act 15 U.S.C. § 78t(a). As indicated above, in lieu of an answer, Defendants filed Motions to Dismiss Plaintiffs' claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Defendants' Motions require the Court not only to apply the pleading requirements of the Federal Rules of Civil Procedure, but also the Court must interpret and apply the provisions of the Private Securities Litigation Reform Act of 1995.

As the Sixth Circuit observed in *Helwig v. Vencor, Inc.,* 251 F.3d 540 (6th Cir.2001),

[A private litigant's securities fraud] complaint reflects the tension between the liberal requirements of notice pleading, *See Miller v. American Heavy Lift Shipping,* 231 F.3d 242, 248 (6th Cir. 2000) ("This fundamental tenor of the Rules is one of liberality rather than technicality, and it creates an important context within which we decide cases under the modern Federal Rules of Civil Procedure"), and concern about "strike suits" aimed at jackpot discovery and predatory settlement, *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (noting that the discovery process in securities litigation "permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence.").

251 F.3d at 547.

In 1995, Congress attempted to resolve this tension by implementing "procedural protections to discourage frivolous litigation." *Id.,* quoting H.R. Conf. Rep. No. 104–369 at 32 (1995), U.S.Code Cong. & Admin. News at 730, 731. The resulting law, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") heightened the pleading standard for securities fraud.

The PSLRA provides, in pertinent part, as follows:

(1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the state-

ment made, in the light of the circumstances in which they were made, not misleading;

**the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.**

(2) Required state of mind
In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, **the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.**

15 U.S.C. § 78u–4(b)(1), (2) (emphasis added).

The Act further requires dismissal of any action which fails to meet any of the above statutory pleading requirements:

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u–4(b)(3) (emphasis added).

As the Sixth Circuit explained in *Helwig, supra,* to a large extent, the standards applicable to Rule 12(b)(6) motions to dismiss remain unchanged. 251 F.3d at 553. Accordingly, the court "must construe the complaint in a light most favorable to the plaintiff," *id.,* (quoting *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir.1998)), and accept as true "well pleaded facts" set forth therein. *Comshare, supra,* 183 F.3d at 547 (quoting *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987)).

While the *Helwig* court noted the continued viability of the foregoing Rule 12(b)(6) standards in the aftermath of the PSLRA, the court made clear that securities fraud complaints are subject to a more stringent 12(b)(6) scrutiny:

> [T]he Reform Act did not reverse the polarity of securities pleading. As always under Rule 12(b)(6), we will indulge plaintiffs' inferences of fraud—**provided, of course, those inferences leave little room for doubt as to misconduct.... Inferences must be reasonable and strong**—but not irrefutable. "Strong inferences" nonetheless involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact. Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. Rather **the "strong inference" requirement means that plaintiffs are entitled *only to the most plausible of competing inferences*.... This represents a significant strengthening of the pre-PSLRA standard under Rule 12(b)(6), which gave the plaintiff the benefit of *all* reasonable inferences,"** *Cameron v. Seitz,* 38 F.3d 264, 270 (6th Cir.1994) (emphasis added), **and contemplated dismissal "only if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations."** *Bloch,* 156 F.3d at 677 (emphasis added) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

*Helwig, supra,* 251 F.3d at 553 (emphasis added).[9] The Court will apply the foregoing standards, in deciding Defendants' Motions to Dismiss in this case.

## B. *PLAINTIFFS' SECTION 10(b)/ RULE 10b–5 CLAIM*

To state a Section 10(b)/Rule 10b–5 claim, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *See, In re Comshare, supra,* 183 F.3d at 548. *See also,* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.[10]

---

**9.** The foregoing discussion makes clear that Plaintiffs' argument that the Court decide Defendants' Motions by applying Fed.R.Civ.P. 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," is without merit.

**10.** Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides, in pertinent part as follows:

> It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange—
>
> \* \* \* \* \* \*
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest for the protection of investors.

15 U.S.C.A. § 78j(b) (2003 Supp.).

Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> \* \* \* \* \* \*
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....

17 C.F.R. § 240.10b–5(b).

### 1. PLAINTIFFS MAY NOT "GROUP PLEAD" THEIR ALLEGATIONS OF SECURITIES FRAUD

█ In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that a defendant in a civil suit under § 10(b) and Rule 10b–5 cannot be held liable for "aiding and abetting" the misleading statements or omissions of others. 511 U.S. at 183–84, 114 S.Ct. 1439. Instead, a defendant can only be held liable under Section 10(b) and Rule 10b–5 for the false or misleading statements that he actually makes. *Wright v. Ernst & Young, LLP,* 152 F.3d 169, 175 (2nd Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999) ("actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination"). As the Second Circuit explained in *Shapiro v. Cantor,* 123 F.3d 717 (2nd Cir.1997), "If *Central Bank* is to have any real meaning, a defendant *must actually make* a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under

Section 10(b)." *Id.* at 720. Thus, to state a claim against a particular defendant under Section 10(b)/Rule 10b–5, a complaint must identify each allegedly false or misleading statement or omission made by that defendant.

█ Plaintiffs here have "group pled" their 10(b)/Rule 10b–5 claim, attributing *all* the alleged misrepresentations to *all* Defendants—the individual corporate officers and the outside auditors—collectively. Not only does such "group pleading" run afoul of *Central Bank* but also it fails to meet not only Fed.R.Civ.P. 9(b)'s specificity requirements but also the heightened standards for pleading a Section 10(b) violation after passage of the PSLRA. *See In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 888 (W.D.N.C.2001) ("[G]roup pleading is clearly inconsistent with Rule 9(b)'s express requirements of specificity"); *Coates v. Heartland Wireless Comms., Inc.* 26 F.Supp.2d 910, 916 (N.D.Tex.1998) ("the PSLRA codifies a ban against group pleading"); *Marra v. Tel–Save Holdings, Inc.,* 1999 WL 317103 at *5 (E.D.Pa.1999) ("[T]he presumption inherent in group pleading is inconsistent with the PSLRA's purpose"); *In re Premiere Technologies Inc. Sec. Litig.,* 2000 WL 33231639 at *11 (N.D.Ga.2000) ("The group pleading doctrine did not survive the enactment of the PSLRA").[11]

---

11. The Court notes that even prior to the passage of the PSLRA, only three circuits—the First, Ninth and Tenth Circuits—had specifically recognized a "group pleading" exception to the pleading-with-particularity requirements of Fed.R.Civ.P. 9(b). *See Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987) ("In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers."); *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1254 (10th Cir.1997) (citing *Wool v. Tandem* and holding that "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omis-

sions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers.") Also, pre-PSLRA, the First Circuit recognized a very limited version of the group pleading doctrine for securities fraud, which, although characterized as "group pleading," in essence, requires specific indicia of the defendant officer or director's direct participation in the making of the alleged offending statement. *See Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 367–368 (1st Cir. 1994) ("The acceptance of responsibility for the contents of the Annual Report, demonstrated by defendants' signatures, combined with specific allegations that they knew of conflicting conditions, establishes a sufficient link between the defendants and the alleged

Although the Sixth Circuit has not addressed the issue of whether the group pleading doctrine survived the PSLRA and the courts, nationally, are divided on this issue,[12] this Court agrees with those courts that have found that the. doctrine is at odds with new Act's plain language and pleading requirements. The PSLRA requires that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be plead

in regards to "each act or omission" sufficient to give rise to a strong inference that "the defendant" acted with the required state of mind. Where individual defendants are the target of the fraud allegations, it would be nonsensical to require that a plaintiff specifically allege facts regarding scienter as to each defendant, but to allow him to rely on group pleading in asserting that "the defendant" made the statement or omission.[13]

fraud to satisfy Rule 9(b)'s particularity requirement.")

Without discussion of the effect of the Reform Act, the Ninth and Tenth Circuits have continued to recognize application of the "group pleading" doctrine in the aftermath of the PSLRA, *see Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065–1066 (9th Cir. 2000); *Schwartz v. Celestial Seasonings, supra.* The First Circuit, however, although not deciding the issue, has specifically questioned the continued viability of the doctrine post-PSLRA. *See In re Cabletron Systems, Inc.,* 311 F.3d 11, 40 (1st Cir.2002).

**12.** *Compare e.g., In re SmarTalk Teleservices, Inc. Sec. Litig.,* 124 F.Supp.2d 527, 545 (S.D.Ohio 2000); *In re Raytheon Sec. Litig.,* 157 F.Supp.2d 131, 152–53 (D.Mass.2001); *In re Baan Co. Sec. Litig.,* 103 F.Supp.2d 1, 17 (D.D.C.2000); *In re Sunbeam Sec. Litig.,* 89 F.Supp.2d 1326, 1340–41 (S.D.Fla.1999); *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998) (finding that the group pleading doctrine survived the enactment of the PSLRA), with *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 915–16 (N.D.Tex.1998); *In re Miller Indus., Inc. Sec. Litig.,* 12 F.Supp.2d 1323, 1329 (N.D.Ga.1998); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998); *Marra v. Tel–Save Holdings, Inc.,* 1999 WL 317103 (E.D.Pa.1999) (holding that PSLRA abolished group pleading doctrine). *See also,* A.O. Fisher, *Don't Call Me a Securities Law Groupie: The Rise and Possible Demise of the "Group Pleading" Protocol in 10b–5 Cases,* 56 Bus. Law. 991 (2001) (reviewing cases and arguing that the PSLRA undermines doctrine).

Although a number of district courts within the Sixth Circuit have acknowledged the existence of the group pleading doctrine in post-PSLRA cases, those courts that allowed application of the doctrine have done so either without explanation or in reliance upon pre-

PSLRA authority. *See, e.g., In re SmarTalk Teleservices, Inc. Sec. Litig., supra,* 124 F.Supp.2d at 545 (citing the Ninth Circuit's pre-PSLRA decision in *Wool v. Tandem Computers, supra,* court concluded without further explanation that group pleading doctrine survives); *Morse v. McWhorter,* 200 F.Supp.2d 853 (M.D.Tenn.2000), *vacated on other grounds,* 290 F.3d 795 (6th Cir.2002) (same); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.,* 1999 WL 33295037 (W.D.Ky.1999) (citing only non-Sixth Circuit district court authority, court concluded without further explanation that doctrine survived PSLRA); *Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101 (W.D.Mich.1996) (without mentioning PSLRA, court concluded that group pleading doctrine may be applied); *Krieger v. Gast,* 2000 WL 288442 (W.D.Mich.2000) (same); *In re SCB Computer Technology, Inc. Sec. Litig.,* 149 F.Supp.2d 334 (W.D.Tenn. 2001) (without deciding the question, court noted that the Sixth Circuit has not addressed the issue of the continued viability of the doctrine since the passage of the PSLRA); *Yadlosky v. Grant Thornton, L.L.P.,* 120 F.Supp.2d 622 (E.D.Mich.2000) (without mentioning the PSLRA, court noted the existence of the group pleading doctrine but found it inapplicable under the facts of the case); *Benedict v. Cooperstock,* 23 F.Supp.2d 754 (E.D.Mich.1998) (same).

**13.** Because Kmart Corporation is not a party-defendant in this action, we do not reach the issue of whether misrepresentations made in a "group published" corporate statement, e.g., a corporation's annual report, which would be clearly attributable to the corporation may also be attributed to the directors or officers of the corporation pursuant to the group pleading doctrine without running

■ However, even assuming *arguendo* that the Court were to find that the group pleading doctrine survived the PSLRA, Plaintiffs' Complaint allegations in this case are insufficient to invoke the doctrine. First, the mere fact that an individual defendant is an officer or director of the corporation is not enough to invoke to group pleading doctrine. Rather, the plaintiff must allege with specificity facts demonstrating a specific defendant's personal involvement in the preparation of the allegedly misleading statements or direct "operational involvement" with the company; conclusory allegations that the defendant was "involved in the day to day operations" are insufficient. *See, e.g., Morse v. McWhorter, supra,* 200 F.Supp.2d at 903 (application of group pleading doctrine to corporate officers requires specific allegation that the defendant officers "participated in drafting, reviewing *and* approving the misleading statements;" disjunctive "and/or" pleading is insufficient. *Id.* (emphasis in original)); *In re Autodesk Inc. Sec. Litig.,* 132 F.Supp.2d 833, 845 (N.D.Cal.2000) ("For claims against corporate insiders, a plaintiff must allege that the defendants were involved in the preparation of the allegedly misleading statement."); *In re Oak Tech. Sec. Litig.,* 1997 WL 448168 at *11 (N.D.Cal.1997) ("Since all inside officers in a corporation, by virtue of their positions are involved in daily corporate activities, merely pleading as much is not sufficient to establish their liability under the group pleading exception"); *Molinari v. Symantec,* 1998 WL 78120 at *11(N.D.Cal.1998) ("In a company as large as [defendant's], the status of officer or director is not enough in itself to establish involvement in the group "functionally related" to the alleged fraud.").

Here, Plaintiffs allege only boilerplate conclusions that the "Individual Defendants participated in the drafting, preparation and/or approval of the various... reports and other communications" (Compl., ¶ 28), "were able to and did control the content of various... public statements" (*id.* ¶ 29), and were "responsible for the accuracy of the public reports and releases" because they were given copies of such documents before or shortly after dissemination and were in positions to "prevent their issuance or cause them to be corrected." (*Id.* ¶ 29.) Application of the above-cited authorities establishes that Plaintiffs' allegations are insufficient to invoke the group pleading doctrine. *See e.g., Morse v. McWhorter, supra* (alleging that defendants participated in drafting, reviewing *and/or* approving the misleading statements held insufficient to invoke group pleading). *See also, Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 368 (1st Cir.1994) (alleging only that defendants authorized or acquiesced in press releases held insufficient to establish their liability for the content of the press releases under group pleading doctrine).

■ The group pleading doctrine is also inapplicable to oral communications by a single individual—such statements are not considered to be the product of the group's "collective action." *See In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1239–40 (N.D.Cal.1994). Most of the statements Plaintiffs allege to be false and misleading are, in fact, quoted statements of one Defendant—Defendant Conaway. Because these statements were made by a specific individual, they cannot be attributed to the other Defendants under the group pleading doctrine. *See In re Smar-*

afoul of the pleading-with-particularity requirements of Rule 9(b) and the PSLRA when

those officers or directors, *along with the corporation* are sued in a Section 10(b) action.

*Talk Teleservices, Inc. Sec. Litig., supra,* 124 F.Supp.2d at 545 ("There can be no inference that an oral statement of one officer represents the 'collective action' of others"); *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co., supra,* 940 F.Supp. at 1128 ("[T]he group pleading presumption does not apply to oral statements made by individual defendants"); *Gaylinn v. 3Com Corp.,* 2000 WL 33598337 at *9 (N.D.Cal.2000) (holding that "non-speaking defendants" were not liable under the group pleading doctrine where "all of the allegedly false and misleading statements are either oral communications or written quotations of oral communications" of another defendant).[14]

Based upon the foregoing, the Court will examine the sufficiency of Plaintiffs' Complaint with respect to statements Plaintiffs have specifically attributed to particularly-identified Defendants.

## 2. PLAINTIFFS' ALLEGATIONS CONCERNING ALLEGEDLY FRAUDULENT STATEMENTS MADE BY THE VARIOUS DEFENDANTS

### a. Defendant Boyer

Plaintiffs' Complaint allegations regarding Defendants Boyer, Hilzinger, Welch and Schwartz are sparse. As indicated above, Mr. Boyer worked for Kmart for only six months, resigning on November 9, 2001. Plaintiffs' only allegation concerning Mr. Boyer is that he signed the First and Second Quarter Form 10–Qs which were filed with the SEC. (Compl., ¶¶ 54, 64).[15] In his capacity as Kmart's CFO, Mr. Boyer was required by the SEC's rules to sign each 10–Q.[16]

Plaintiffs' Complaint, however, does not allege that any statement in the First Quarter 2001 Form 10–Q was false or misleading. Although the Complaint details numerous statements by Kmart and identifies which are alleged to be false or misleading, nowhere in the Complaint do Plaintiffs allege that the First Quarter 10–Q was false or misleading. Paragraphs 54 and 64 of the Complaint simply identify the First and Second Quarter 10–Qs, respectively, the persons who signed them, and certain statements they contained.[17]

---

**14.** Nor can the group pleading doctrine be used to attribute to an officer or director alleged misstatements made before the officer or director joined or after he left the company's employ. *See Berry v. Valence Tech., Inc.,* 175 F.3d 699, 706–07 (9th Cir.1999), *cert. denied,* 528 U.S. 1019, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999) (dismissing claims against former CEO and holding that in absence of any allegations that he had continued operational involvement in the company, former CEO could not be held liable for statements made after his retirement). *See also, In re Ramp Networks, Inc. Sec.,* 201 F.Supp.2d 1051, 1078 (N.D.Cal.2002) (dismissing claims against former officer, holding that group published doctrine cannot apply to statements made after he was fired; *In re Segue Software, Inc. Sec. Litig.,* 106 F.Supp.2d 161, 169 n. 17 (D.Mass.2000) (dismissing complaint holding company's CFO and Senior V.P. of Administration could have played no part in alleged securities fraud before he joined the company); *In re Raytheon Sec. Litig., supra,* 157 F.Supp.2d at 153 (holding that group pleading doctrine could not be used to attribute to Senior Vice–President and CFO of the

company allegedly fraudulent statements made in quarterly reports before he joined the company where there was no allegation that he knew of the statements or that he had sufficient knowledge to know they were false).

**15.** The Form 10–Q for the first quarter 2001 was also signed by Defendant Hilzinger. The 10–Q for the second quarter 2001 was signed by Defendants Boyer, Conaway and Schwartz.

**16.** The SEC's Form 10–Q General Instruction G states in pertinent part, "At least one copy of the report filed with the Commission and on such copy filed with each exchange shall be manually signed on the registrant's behalf by... the principal financial or chief accounting officer of the registrant."

**17.** Paragraph 54 states:
Also, on May 17, 2001, Kmart filed its Form 10–Q for the first quarter of 2001, the period ending May 2, 2001 (the "First Quarter 10–Q"), with the SEC which was signed by defendants Boyer and Hilzinger. The fi-

Immediately following both of these paragraphs, the Complaint catalogues a total of ten statements made by Kmart and Defendants other than Mr. Boyer that Plaintiffs allege were false and misleading, but conspicuously omits any allegation that either the First or Second Quarter 10–Q was false or misleading. (*See* Compl., ¶¶ 55, 65.)

Further, the Complaint's text does not allege that Defendant Boyer himself engaged in any action other than signing the First and Second Quarter 10–Qs. In fact, Boyer is mentioned only five times in the 169–paragraph Corrected Amended Consolidated Complaint: (1) to identify him as Kmart's former CFO and state his dates of employment [Compl., ¶ 21]; (2) to define

him and the other individual defendants as the "Individual Defendants" *id.*, ¶; (3) to state that he signed the First Quarter 10–Q, *id.*, ¶ 54; (4) to state that he signed the Second Quarter 10–Q, *id.*, ¶ 64; and (5) to state that he resigned on November 9, 2001. *Id.*, ¶ 71. There is no allegation in the Complaint's text that Defendant Boyer made false statements about Kmart or its financial condition, no allegation that Boyer authorized or received any retention bonuses or that these retention bonuses were paid to anyone while Boyer was employed at Kmart.

Nor are there any allegations against Mr. Boyer in the anonymous letters purportedly from Kmart employees referenced in ¶¶ 8 and 9 of the Corrected Amended Consolidated Complaint.[18] How-

---

nancial statements contained in the First Quarter 10–Q reported that for the first quarter the "Cost of sales, buying and occupancy" was $6,608,000,000, gross margins were $1,729,000,000, and net income was a loss of $(0.05) per share. With respect to the financial statements contained therein, the First Quarter 10–Q represented that:

These interim consolidated unaudited financial statements have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC") and, in the opinion of management, reflect all adjustments (which include normal recurring adjustments) necessary for a fair statement of the results for the interim periods.

Paragraph 64 states:

On August 23, 2001, Kmart filed its Form 10–Q for the second quarter of 2001, the period ending August 1, 2001 (the "Second Quarter 10–Q"), with the SEC which was signed by defendants Conaway, Boyer and Schwartz. The financial statements contained in the First Quarter 10–Q reported that for the second quarter the "Cost of sales, buying and occupancy" was $7,058,000,000, gross margins were $1,859,000,000, and net income was a loss of $(0.19) per share. With respect to the financial statements contained therein, the Second Quarter 10–Q represented that:

These interim consolidated unaudited financial statements have been prepared in accordance with the rules and regula-

tions of the Securities and Exchange Commission ("SEC") and, in the opinion of management, reflect all adjustments (which include normal recurring adjustments) necessary for a fair statement of the results for the interim periods.

18. The Corrected Amended Consolidated Complaint references four anonymous letters (dated January 9, 2002; February 15, 2002; March 20, 2002; and March 22, 2002) purportedly from unnamed Kmart financial department employees which raise issues with the Company's accounting and the integrity of Kmart management. Paragraph 9 of the Corrected Amended Consolidated Complaint further states that copies of the letters "are attached hereto as Exhibit A." However, these letters were never attached to the November 1, 2002 Corrected Amended Consolidated Complaint (although they were attached to Plaintiffs' previous Consolidated Amended Complaint filed three months earlier, on August 15, 2002.) At oral argument, Plaintiffs' counsel explained that the failure to attach the letters to the Corrected Amended Consolidated Complaint was simply an oversight. It was Plaintiffs' intent that the letters be incorporated by reference in the November 1, 2002 Amended Complaint and, inasmuch as the text of this most recent complaint specifically references and cites to the letters, the Court accepts Plaintiffs' explanation and since all Defendants received the documents attached

ever, there is at least one allegation in the March 20, 2002 letter that the financials reported in the second quarter 2001 were "deliberately manipulated and misreported." [*See* Exh. A, 3/20/02 letter.]

Since Mr. Boyer signed the second quarter 2001 10–Q which contained these financials, the Court finds that Plaintiffs' Complaint sufficiently alleges that Mr. Boyer made a misrepresentation when he signed the second quarter 2001 10–Q which stated that the financial statements contained therein represented a "fair statement of the results" for the quarter.

**b. *Defendants Hilzinger and Welch***

As indicated, Defendant Hilzinger signed Kmart's 10–Q for the First Quarter of 2001 along with Defendant Boyer. As discussed above, Plaintiffs' Complaint, however, does not allege that any statement in the First Quarter 2001 Form 10–Q was false or misleading. Therefore, no action of securities fraud against Defendant Hilzinger may be predicated upon this Form 10–Q.

■ Defendants Hilzinger and Welch signed Kmart's 10–K for fiscal year 2000. Plaintiffs allege that this Form 10–K contained the following two false statements: (1) Kmart's "financial statements reasonably presented our finance position and results of operation," and (2) "we maintain comprehensive systems of internal controls designed to provide reasonable assurance that assets are safeguarded and transactions are executed in accordance with established procedures." (Compl., ¶ 49(e)). The excerpted statements in Paragraph 49(e) are excerpts from a statement contained within the 2000 Form 10–K entitled "Management's Responsibility for Financial Statements." *See* Compl., ¶ 48. The statement in full reads as follows:

Management is responsible for the preparation of our consolidated financial statements and related information appearing in this annual report. These financial statements have been prepared in conformity with generally accepted accounting principles on a consistent basis applying certain estimates and judgments based upon currently available information and management's view of current conditions and circumstances. On this basis, *we believe that these financial statements reasonably present our financial position and results of operations.*

To fulfill our responsibility, *we maintain comprehensive systems of internal controls designed to provide reasonable assurance that assets are safeguarded and transactions are executed in accordance with established procedures.* The concept of reasonable assurance is based upon a recognition that the cost of the controls should not exceed the benefit derived. **We believe our systems of internal controls provide this reasonable assurance.**

We have adopted a code of conduct to guide our management in the continued observance of high ethical standards of honesty, integrity, and fairness in the conduct of the business and in accordance with the law. Compliance with the guidelines and standards is periodically reviewed and is acknowledged in writing by all management associates.

Our Board of Directors have [sic] an Audit Committee, consisting solely of outside directors. The duties of the Committee include keeping informed of the financial condition of Kmart and reviewing our financial policies and procedures, our internal accounting controls, and the objectivity of our financial re-

---

to their copies, the Court will treat the letters as attached to and incorporated into Plain-

tiffs' Corrected Amended Consolidated Complaint.

porting. Both our independent accountants and the internal auditors have free access to the Audit Committee and meet with the Committee periodically, with and without management present.
Complaint, ¶ 48.[19]

■ The full text makes clear that the statements which Plaintiffs contend are false are statements of opinion. ("We believe that these financial statements reasonably present our financial position and results of operations"; "we maintain comprehensive systems of internal controls [which] we believe provide ... reasonable assurance [that asset are safeguarded and transactions are executed in accordance with established procedures].") It is well-settled that opinions such as these provide a basis for liability only under very limited circumstances. Material statements which contain the speaker's opinion are actionable under Section 10(b) only if the speaker does not believe the opinion and the opinion is not factually well-grounded. *See Helwig, supra,* 251 F.3d at 561; *Mayer v. Mylod,* 988 F.2d 635, 639 (6th Cir.1993). *See also, Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3rd Cir.1985), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (holding that statements of opinion only constitute actionable "false or misleading" statements under the securities laws if plaintiffs can plead and prove that they were made "without a genuine belief or reasonable basis.")

■ Here, the Plaintiffs' Complaint pleads no facts with particularity giving rise to any inference that either Mr. Welch or Mr. Hilzinger did not actually believe

these allegedly false opinions. Therefore, neither Mr. Welch nor Mr. Hilzinger can be held liable under § 10(b) for such statements of opinion by management, even if they ultimately are proven to be untrue.

#### c. *Defendant Schwartz*

Defendant Schwartz signed Kmart's 10–Q for the Second Quarter of 2001, along with Defendants Boyer and Conaway. As discussed above, there is at least one allegation in the March 20, 2002 letter, attached to and incorporated by reference in the Corrected Amended Consolidated Complaint, that the financials reported in the second quarter 2001 were "deliberately manipulated and misreported."

Other than the second quarter 2001 10–Q, there are only six other paragraphs in the Complaint, containing three sets of allegations, explicitly about Defendant Schwartz. These allegations are as follows: (1) Mr. Schwartz served as Kmart's President and COO from March 14, 2001 until November 2001, and before that, he acted as the Executive Vice–President of Store Operations; (2) Mr. Schwartz received a retention bonus, or loan, and "excessive" compensation during his tenure at Kmart; and (3) Kmart issued a January 17, 2002 press release announcing Schwartz's termination. (*See* Compl., ¶¶ 12, 22, 31, 64, 75, and 90.)

According to one of the Exhibit A anonymous letters, there was one additional "statement" allegedly made by Defendant Schwartz. In Paragraph 9 of the Complaint, Plaintiffs quote from this anonymous letter and state:

19. Kmart's 10–K attributes this statement only the Messrs. Conaway and Welch, not Mr. Hilzinger. *See* Mar. 21, 2001 Fiscal Year 2001, Form 10–K, Defendants Hilzinger and Welch's Ex. D, p. 55. (In a securities fraud action, the court may consider the full text of SEC filings, prospectus, analysts' reports and statements "integral to the complaint," even

if not attached to the complaint, without converting a Rule 12(b)(6) motion into one for summary judgment under Fed.R.Civ.P. 56. *Bovee v. Coopers & Lybrand C.P.A.,* 272 F.3d 356, 360–61 (6th Cir.2001). *See also I. Meyer Pincus & Assoc. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2nd Cir.1991)).

In May 2001, Mr. Mark Schwartz, President and Chief Operating Officer, told our superior not to be surprised if Kmart shares were trading at four or five dollars per share by the end of the year. He did not explain why shares would drop to that level but suggested management employees could benefit significantly from stock options which would be priced at that depressed level. Compl., ¶ 9.

 Although Plaintiffs have not alleged that this particular alleged statement was false or misleading, as indicated above, the letters attached at Exhibit A contain sufficient allegations to create an inference that the second quarter 2001 10–Q, which Defendant Schwartz signed, was false, and that Schwartz had reason to know they were false.[20] Therefore, the Court finds that Plaintiffs have sufficiently alleged that Defendant Schwartz made an untrue statement of material statement.

### d. *Defendant Conaway*

By contrast to the foregoing paucity of allegations concerning Defendants Boyer, Hilzinger, Welch and Schwartz, Plaintiffs' Complaint is replete with statements specifically attributed to Defendant Conaway and specifies the dates and specific content of each such misrepresentation. *See e.g.,* Complaint ¶ 47 (March 13, 2001 Kmart press release with statements by Defendant Conaway concerning financial results for the full year and fourth quarter of fiscal year 2000); ¶ 48 (2000 Form 10–K signed by Conaway); ¶ 50 (April 2, 2001 Kmart press release with statements by Conaway concerning the return of the Bluelight Special); ¶ 51 (April 12, 2001 Kmart press release with statements by Conaway concerning same store sales for the four-week period ending April 4, 2001); ¶ 52 (May 10, 2001 Kmart press release with statements by Conaway concerning same store sales for four-week period ending May 2, 2001); ¶ 53 (May 17, 2001 Kmart press release with statements by Defendant Conaway concerning financial results for the first quarter of 2001); ¶ 56 (June 7, 2001 press release statements by Defendant Conaway concerning same store sales for the four-week period ending May 30, 2001); ¶ 58 (July 12, 2001 press release and statements by Conaway con-

---

**20.** With regard to the Exhibit A letters, Defendant Schwartz argues that they should be stricken from the Complaint and record because they are "anonymous" letters, and as such are not "written instruments" under Fed.R.Civ.P. 10(c), and contain "redundant, immaterial, impertinent or scandalous" material, subject to an order to strike under Rule 12(f). (Interestingly, at oral argument, Schwartz's counsel, Brian Rosner, conceded to the Court that if the Court was prepared to accept these anonymous letters as well-pleaded allegations of the Complaint he might as well "just sit down." (*See* Hearing Tr. p. 68.)) First, to the extent that Defendant argues that the letters are not "written instruments," the Court rejects Defendant's argument. The term "written instruments" clearly includes letters. *See, e.g., Kentucky State Dist. Council of Carpenters v. Wehr Construction, Inc.,* 1993 WL 288277 (6th Cir.1993) (unpublished decision; text available on WESTLAW); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2nd Cir.1991); *Eagle Nation, Inc. v. Market Force, Inc.,* 180 F.Supp.2d 752, 754 (E.D.N.C.2001); *Ridgeway Coal Co. v. FMC Corp.,* 616 F.Supp. 404 (S.D.W.Va.1985). Nor does the Court find that the material contained within the letters is such "redundant, immaterial, impertinent or scandalous matter" subject to being stricken under Rule 12(f). At oral argument, Defendant's counsel also argued that the letters should be stricken because the authors of the letters are "anonymous." However, Defendant has cited no authority for this proposition, and as discussed *infra* in the text of this Opinion, the courts have expressly sanctioned maintaining the anonymity of sources of information giving rise to allegations of securities fraud. [*See* discussion in Section B(2)(d) of this Opinion.] For these reasons, Defendant Schwartz's Motion to Strike Exhibit A is denied.

cerning same store sales for the four-week period ending July 4, 2001); ¶ 60 (August 1, 2001 press release and statements by Conaway concerning the acquisition of Bluelight.com); ¶ 61(August 9, 2001 press release and statements by Defendant Conaway concerning same store sales for the four week period ending August 1, 2001); ¶ 63 (August 23, 2001 press release and statements by Conaway concerning financial results for the second quarter 2001); ¶ 64 (Second Quarter 10–Q signed by Conaway); ¶ 66 (September 6, 2001 press release and statements by Conaway concerning same store sales for the four-week period ending August 29, 2001); ¶ 67 (September 6, 2001 press release and statements by Conaway concerning the Company's plan to restructure its supply chain infrastructure); ¶ 68 (October 11, 2001 Kmart press release and statements concerning same store sales for the five-week period ending October 3, 2001); ¶ 69 (October 25, 2001 press release and statements by Conaway concerning the addition of Kmart supercenters to its portfolio); ¶ 70 (November 8, 2001 press release and sales concerning same store sales for the four-week period ending October 31, 2001); ¶ 72 (November 27, 2001 Kmart press release and statements by Conaway concerning financial results for the third quarter of 2001); and ¶ 74 (December 6, 2001 press release and statements by Conaway concerning same store sales for the four-week period ending November 28, 2001).

The Complaint also details the precise manner in which these statements were false and misleading. For example, in ¶ 49, the Complaint details in five sub-paragraphs why the statements in ¶ 47 were materially false and misleading. Paragraph 55(a)-(h) set forth the reasons why Conaway's April and May, 2001 press release statements were misleading, including the over-reporting of $311,000,000 of vendor rebates in the first quarter 2001, understating the cost of sales, buy-ing and occupancy by $226,000,000 in the first quarter 2001, understating its losses by $208,000,000. Paragraph 65(a)-(i) similarly explains why Conaway's June, July and August 2001 and the Second Quarter 10–Q signed by him were misleading including the over reporting of $211,000,000 of vendor rebates, overstating the amount of gross margin by $195,000,000, improperly recognizing $42 million in vendor rebates which Plaintiffs allege should have been deferred over the life of the contract, failing to accrue $167 million of expenses in the second quarter and understating its losses by $282,000,000. In paragraph 76(a)-(g), the Complaint summarizes why statements made by Conaway in September–December 2001 were misleading, including reporting $32,000,000 of vendor rebates before earned and without a commitment from the vendor, understating the cost of sales, buying and occupancy by $9,000,000, overstating the amount of gross margin by $9,000,000 and understating losses by $11,000,000.

The facts giving rise to the foregoing summaries of alleged fraud are set forth in the Complaint in ¶¶ 9, 34–46, 104–148.

Defendant Conaway argues, however, that the foregoing allegations regarding the false and misleading nature of his statements do not meet the PSLRA's particularity requirement because Plaintiffs' fraud claim is pleaded "based upon the investigation conducted by and under the supervision of plaintiffs' counsel." (Compl., Introduction). Because allegations pleaded on the investigation of counsel are not based upon the plaintiff's personal knowledge, Defendant Conaway maintains that they are subject to the PSLRA's pleading requirement for "information and belief" allegations—i.e., that the allegations must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(3)(A). Conaway ar-

gues that Plaintiffs' Complaint does not meet this requirement because the sources of many of the allegations—in particular, the allegations contained in ¶¶ 9, 34–40, 43, 45–46, 104–106, 110–111, 130–133, 148(h), and 148(m)—are unnamed. The sources of these allegations are identified in the Complaint as Kmart employees and their positions within the Company (e.g., a former employee "who was employed in the finance department") or their job titles (a former employee "who was a vice president at the Company"; "a former operations manager"; "a former employee of Kmart who was employed as a customer care manager.") *See* Compl., ¶¶ 34, 35, 36, 37.

■ Contrary to Defendant Conaway's assertions, the PSLRA does not require Plaintiffs to reveal the names of these sources. As the Second Circuit specifically held in *Novak v. Kasaks,* 216 F.3d 300 (2nd Cir.2000), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000),

> [W]e find no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources.... Imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them.

*Id.* at 313–14.

The First Circuit recently adopted the Second Circuit's approach in *Novak* in *In re Cabletron Sys., supra,* and held in that case that a court should look at all the facts alleged to see if they provide an adequate basis for believing that a defendant's statements were false. The *Cabletron* court explained:

> This involves an evaluation inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from

other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.

311 F.3d at 29–30.

The First Circuit further reasoned that a blanket ban on unnamed sources presents obvious policy problems: "Employees or others in possession of important information about corporate malfeasance may be discouraged from stepping forward if they must be identified at the earliest stage of a lawsuit." *Id.*

Even *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970 (9th Cir.1999), the case principally relied upon by Defendant Conaway, does not require the identification of confidential sources. Rather, all that the Ninth Circuit held was that the plaintiffs had to allege corroborating details to indicate that the allegations were reliable. *Id.* at 985. Plaintiffs here meet *Silicon Graphics* standard by providing the position or title of each source which is sufficient to support an inference that the source was in a position to perceive first-hand the information attributed to him or her in the Complaint. *Contrast ABC Arbitrage v. Tchuruk,* 291 F.3d 336, 358 (5th Cir.2002) (finding that only the general reference to "employee" was not sufficient to support the probability that a person in the position occupied by the source as described would possess the information pleaded).

Based upon the foregoing, the Court finds no merit in Defendant Conaway's argument that Plaintiffs' Complaint does not state the facts upon which the allegations of fraud are based with sufficient particularity.

### e. *Defendant PricewaterhouseCoopers*

Of the statements that Plaintiffs complain about, only two are attributed to Defendant PwC: PwC's audit opinions on Kmart's 2000 and 2001 annual financial

statements. (Compl., ¶¶ 145–46). As discussed above, a statement of opinion is not the same as a statement of historical fact. Instead, it is an expression of belief, made by an actor at a particular time, under particular conditions, and based on known information. Accordingly, as indicated, it is well-settled that "under securities laws a reasoned and justified statement of opinion, one with a sound factual or historical basis is not actionable." *Connellan v. Himelhoch,* 506 F.Supp. 1290, 1298 (E.D.Mich.1981) (citing *G & M, Inc. v. Newbern,* 488 F.2d 742 (9th Cir.1973)); *see also, Renz v. Shreiber,* 832 F.Supp. 766, 777–78 (D.N.J.1993).

The opinion rule discussed above is particularly applicable with respect to opinions by auditors, which generally involve issues such as the auditor's dependence on information supplied by the client, application of complex accounting and auditing standards, and varying degrees of professional judgment. As the court observed in *Reiger v. Price Water House Coopers LLP,* 117 F.Supp.2d 1003 (S.D.Cal.2000), *aff'd,* 288 F.3d 385 (9th Cir.2002):

> [T]he report generated by an independent accountant often represents a professional opinion based on numerous and complex factors. Although ultimately expressed in shorthand form, the report is the final product of a complex process involving discretion and judgment on the part of the auditor at every stage. Using different initial assumptions and approaches, different sampling techniques, and the wisdom of 20/20 hindsight, few CPA audits [are] immune from criticism.

*Id.* at 1008 (citations omitted).

■ Thus, as indicated above, statements of opinion, such as PwC's audit opinions on Kmart's annual financial statements, only constitute actionable "false or misleading" statements under the securities laws if Plaintiffs can plead and prove that they were made "without a genuine

belief or reasonable basis." *Eisenberg v. Gagnon, supra,* 766 F.2d at 776; *Helwig, supra,* 251 F.3d at 561; *Mayer v. Mylod, supra,* 988 F.2d at 639.

■ Plaintiffs have not satisfied this requirement. First, Plaintiffs claim that because PwC had access to certain unspecified Kmart "internal accounting records," PwC "knew or recklessly disregarded" that Kmart's 2000 and 2001 financial statements did not conform with GAAP [generally accepted accounting principles] and did not fairly present Kmart's financial position, as the opinions stated. (Compl., ¶¶ 144, 147). Plaintiffs, however, have alleged no facts to support these claims.

Conclusory allegations of access to unspecified "internal records" are insufficient to support a claim of "knowledge" or "reckless disregard" on the part of an auditor. *See, e.g., Zucker v. Sasaki,* 963 F.Supp. 301, 306 (S.D.N.Y.1997) ("[T]he amended complaint simply asserts that as Cygne's auditors, with access to Cygne's internal documents, Ernst & Young knew or was reckless in not knowing that FWM goodwill was materially overstated.... This conclusory and fact-deficient allegation is insufficient to allege securities fraud.") Nowhere does the Complaint here specify what, if any, "internal accounting records" PwC allegedly saw (or "recklessly disregarded"), let alone any records which showed the specific problems with Kmart's 2000 and 2001 annual financial statements that Plaintiffs allege existed. Absent such specific allegations, Plaintiffs have not alleged that PwC's opinions were issued "without a genuine or reasonable basis."

■ Plaintiffs also claim that PwC's opinions were false because PwC "knew or recklessly disregarded" that PwC had not conducted its 2000 and 2001 audits in accord with GAAS. (Compl., ¶ 147). The Sixth Circuit, however, has expressly held

that violations of accounting or auditing standards standing alone do not support a strong inference of recklessness. *See In re Comshare, supra,* 183 F.3d at 553.

Furthermore, nowhere does the Complaint specify the "who, what, when, where and how" of any purported GAAS [generally accepted auditing standards] violations. All that Plaintiffs have done is recite a list of general GAAS requirements, and then assert, without any factual support, that because Kmart's financial statements were allegedly incorrect, PwC "must have" violated those requirements. (*See* Compl., ¶¶ 148–149).

This precise kind of pleading was found to fail to satisfy the requirements of the PSLRA by the court in *In re SmarTalk Teleservices, Inc. Sec. Litig., supra:*

> In short, the Plaintiffs plead that because errors [in the financial statements] were committed, [the auditors] must have violated the procedures set up to catch such errors and had they not violated these procedures they would have caught the errors. These allegations fail under the PSLRA as overly general and speculative.

124 F.Supp.2d at 517.

Because Plaintiffs fail to allege any facts establishing that PwC's 2000 and 2001 audit opinions were issued "without a genuine belief or reasonable basis," they have failed to sufficiently specify "the reason or reasons why" the subject audit opinions were allegedly false or misleading as required by the PSLRA. Plaintiffs' 10(b) claim against PricewaterhouseCoopers, therefore, will be dismissed.

### 3. *THE COMPLAINT'S SCIENTER ALLEGATIONS*

Pursuant to the PSLRA, a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also, Helwig, su-*

*pra,* 251 F.3d at 548. This "state of mind" requirement requires some form of fraudulent intent. *Id. See also, Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (holding that scienter, "a mental state embracing intent to deceive, manipulate or defraud" is an essential element of a § 10b/Rule 1b–5 claim).

Under the Sixth Circuit's interpretation of the PSLRA, recklessness—that is, "highly unreasonable conduct which is an extreme departure from the standards of ordinary care"—may satisfy the "state of mind" requirement. *Helwig, supra,* 251 F.3d at 550. The *Helwig* court emphasized, however, that bare allegations of recklessness or facts showing only a "motive and opportunity" to commit fraud, are insufficient to meet the PSLRA's heightened pleading requirement:

> We hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud.... While facts regarding motive and opportunity may be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred, and may on occasion, rise to the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter.

251 F.3d at 550 (quoting *Comshare, supra,* 183 F.3d at 551.)

Instead, the *Helwig* court suggested a "totality of the circumstances" analysis, and pointed to several factors to aide lower courts in deciding whether the scienter requirement has been met. These factors are as follows:

1) insider trading at a suspicious time or in an unusual amount;

2) divergence between internal reports and external statements on the same subject;

3) closeness in time of an alleged fraudulent statement or omission and the later disclosure of inconsistent information;

4) evidence of bribery by a top company official;

5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of this suit;

6) disregard of the most current factual information before making statements;

7) disclosure of negative accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). *See also, Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002) (citing *Helwig*). The determination of whether Plaintiffs have sufficiently alleged the requisite state of mind as to each of the Defendants, therefore, requires a "fact sensitive" analysis of the Complaint's allegations "to determine whether the facts as pled produce a strong inference that [each of the particular Defendants] acted at least recklessly." *In re Ford Motor Co. Sec. Litig.*, 184 F.Supp.2d 626, 630 (E.D.Mich. 2001).

■ Further, even assuming *arguendo* that the group pleading (or group publication) doctrine survived the passage of the PSLRA, those courts that have continued to apply the group pleading doctrine have held that scienter must be pled separately as to *each* defendant. *See e.g., In re Sunbeam Sec. Litig., supra,* 89 F.Supp.2d 1326 ("[G]roup pleading does not apply to the [PSLRA's] scienter requirements"); *In re Lernout & Hauspie Sec. Litig.,* 208 F.Supp.2d 74, 84 (D.Mass.2002) (group publication doctrine "does not, however, obviate the requirement that a court evaluate separately the allegations concerning the scienter of each of the individual defendants"); *In re Baan Co. Sec. Litig., supra,* 103 F.Supp.2d at 17–18 (group publication doctrine applies to attribute misrepresentations but scienter must be pleaded as to each defendant).

Applying the foregoing standards in this case, the Court finds as follows.

a. *Defendant Boyer*

■ First, with respect to Defendant Boyer the Court finds that the Complaint fails to allege facts giving rise to a strong inference that he acted with the requisite state of mind to establish a securities fraud claim against him. There are no factual allegations within the Complaint that show that Mr. Boyer made any intentional misstatements or omissions or that when he made the statements attributed to him (i.e., by signing the First and Second Quarter 10–Qs) that he engaged in "highly unreasonable conduct" evincing an "extreme departure from the standards of ordinary care." *Comshare, supra.* Furthermore, statements made in the four anonymous letters from Kmart financial department employees attached as Exhibit A and incorporated by reference in the Corrected Amended Consolidated Complaint actually exonerate Boyer and give rise to a strong inference that he acted with a high degree of care "directing" his subordinates "to closely follow standard accounting principles," and being "forced"

out of his job as a result. (*See* Ex. A, 1/9/02 Letter.)

The only scienter allegations concerning Mr. Boyer in the Corrected Amended Consolidated Complaint is the conclusory "group" allegation that all the Individual Defendants must have known of the alleged misstatements' falsity because of their high managerial positions within Kmart. (*See* Compl., ¶¶ 28, 89). However, courts have routinely rejected the attempt to plead scienter based on allegations that because of the defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook. *See, e.g. Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 432 (5th Cir.2002); *In re Credit Acceptance Corp. Sec. Litig.,* 50 F.Supp.2d 662, 676 (E.D.Mich.1999) (stating that alleging defendants knew or should have known because of their positions in a company does not raise a strong inference of scienter); *In re Sunterra Corp.,* 199 F.Supp.2d 1308, 1325 (M.D.Fla.2002); *In re Azurix Corp. Sec. Litig.,* 198 F.Supp.2d 862, 890 (S.D.Tex.2002), *aff'd,* 332 F.3d 854 (5th Cir.2003) ("merely alleging that the defendants knew or had access to information by virtue of their managerial positions is not sufficient to plead scienter").

The Complaint also alleges that the Defendants collectively "knew or recklessly ignored" GAAP violations. However, "[c]ourts have determined that GAAP violations standing alone, do not satisfy the scienter requirement for securities fraud." *Stavroff v. Meyo,* 1997 WL 720475, at * 6 (6th Cir.1997) (unpublished decision); *see also Comshare,* 183 F.3d at 549.

There are no allegations in the Complaint about Boyer's compensation or that he received any "retention loans." To the contrary, the Exhibit A letters assert that "the retention loan program was put into effect following the forced departure of CFO Boyer." (Ex. A, 1/9/02 Letter).[21] Further, there are no allegations of any "insider trading" by Mr. Boyer.[22]

The foregoing establishes that Plaintiffs' Complaint fails as a matter of law to adequately allege that Defendant Boyer acted with the requisite scienter.

### b. *Defendants Hilzinger and Welch*

■ Similarly, Plaintiffs' Complaint does not allege that either Defendant Hilzinger or Welch had any personal motive to commit fraud. The Complaint does not allege that either of these Defendants obtained retention loans or bonuses, nor are there any allegations of insider trading. As with Defendant Boyer, the Complaint does not allege that Messrs. Hilzinger and Welch were aware of any fact, discussion, meeting or memorandum that would

---

**21.** At oral argument, Plaintiffs' counsel mischaracterized the allegations concerning Defendant Boyer in the Exhibit A letters contending that his scienter may be inferred from a supposed statement in one of the letters that Boyer had purportedly said he left Kmart because he "wouldn't do it [i.e., cook the books] anymore." However, there is no such statement in any of the letters. Rather, all that the letters state is that "There have been numerous high level departures from our area and we suggest those individuals be contacted for background on what has been done. Former Chief Financial Offers Martin Welch and Jeffrey Boyer should be contacted." (*See* Jan.

1, 2002 Letter). This statement cannot reasonably be read as stating that Boyer left the company because he would not continue to engage in illegal practices.

**22.** A number of courts have held that the absence of insider trading actually *negates* an inference of scienter. *See, e.g., in re SCB Computer Tech., Inc. Sec. Litig.,* 149 F.Supp.2d 334, 349 (W.D.Tenn.2001); *In re Credit Acceptance Corp. Sec. Litig.,* 50 F.Supp.2d 662, 670 (E.D.Mich.1999); *Bay v. Palmisano,* 2002 WL 31415713, *10 (E.D.La. 2002).

have put them on notice of any alleged fraud or GAAP violations. Nor does the Complaint allege that any of the informants relied upon by Plaintiffs reported the problems within the Company to Mr. Hilzinger or Welch. And, as discussed above, generalized allegations that a defendant "knew or should have known" based solely upon the defendant's position within a company, are insufficient, as are allegations of GAAP violations. Accordingly, the Court finds that Plaintiffs have failed to adequately allege that Defendants Hilzinger and Welch acted with the requisite scienter.

### c. Defendants Conaway and Schwartz

The scienter issue, however, is a different story with respect to Defendants Schwartz and Conaway. Reviewing the Complaint in light of the Sixth Circuit's suggested factors in *Helwig*, the Court notes that the Complaint alleges that Defendants Conaway and Schwartz renegotiated their employment contracts during the Class Period, and both of these Defendants received substantial "retention loans"—Conaway received a $5 million retention loan just eight months before Kmart's bankruptcy filing and Defendant Schwartz received a $3 million retention loan just one month before the bankruptcy.

Furthermore, just two months before the bankruptcy filing, Defendant Conaway continued to make positive statements concerning Kmart's earnings and business. Although not as close in proximity, it was only four months prior to the bankruptcy that Mr. Schwartz along with Mr. Conaway, signed the Second Quarter 10–Q. As noted in *Helwig*, this closeness in time between the allegedly false statements and the "bad news" (of the bankruptcy filing) is evidence of Conaway's and Schwartz's scienter. *See also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir.1996) ("[W]e think the proximity of the date of the allegedly misleading statements and omissions to the end of the ongoing quarter (and the date of eventual disclosure) provides some circumstantial factual support to be taken into account in determining whether the complaint pleads an adequate basis for inferring defendants' culpable knowledge"); *Powers v. Eichen*, 977 F.Supp. 1031, 1038 (S.D.Cal. 1997) (proximity of bad news to optimistic statements is circumstantial evidence that the defendants knew that their optimistic statements were false); *In re Grand Casinos, Inc., Sec. Litig.*, 988 F.Supp. 1273, 1283 (D.Minn.1997) (revelations shortly after allegedly fraudulent statements were made can support an inference of earlier knowledge).

■ And, while GAAP violations, standing alone, will not establish a strong inference of scienter, such violations may be considered as one of the *Helwig* factors. Thus, although the GAAP violations are insufficient to establish scienter on the part of Defendants Boyer, Hilzinger and Welch, when considered in conjunction with their renegotiated salaries and substantial retention loans, the "optimistic" statements made by Conaway and Schwartz within only a few months of the bankruptcy filing, and the alleged statement of Defendant Schwartz in May 2001 "not to be surprised if Kmart shares were trading at [only] four or five dollars by the end of the year" (Compl., ¶ 9), the Court finds sufficient evidence supporting a strong inference of scienter on the part of these two Individual Defendants.

Thus, to the extent that Defendants Conaway and Schwartz seek dismissal of Plaintiffs' 10(b)/Rule 10b–5 claim against them on the grounds of failure to sufficiently allege scienter, the Court rejects their arguments.

d. *PricewaterhouseCoopers*

As noted above, Plaintiffs' 10(b) claims against Defendant PwC are predicated upon PwC's audit reports of Kmart's 2000 and 2001 annual financial statements. However, Plaintiffs have failed to allege facts that would support a strong inference that PwC issued its two audit reports with scienter.

While recklessness can satisfy the scienter requirement in certain circumstances, *see In re Comshare, supra*, allegations of recklessness as a form of negligence are not sufficient. *Id.* 183 F.3d at 550. Instead, as the Sixth Circuit has explained, "some form of fraudulent intent is required." *Helwig, supra*, 251 F.3d at 548. Accordingly, the degree of recklessness required to state a securities fraud claim must be such that it equates with intentional conduct, and thus must involve

> highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must be so obvious that any reasonable many would have known it.

*Comshare, supra*, 183 F.3d at 550; *Helwig*, 251 F.3d at 550.

As the Southern District of Ohio observed in *In re SmarTalk, supra*, the standard for recklessness in securities fraud cases is more onerous where, as here, the claim is brought against an outside auditor. 124 F.Supp.2d at 514. With respect to auditors, the degree of recklessness must "entail[ ] a mental state so culpable that it approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Id.* Allegations of accounting errors, misapplication of GAAP, or even a failure to comply with GAAS, are not sufficient. Instead, the complaint must set forth specific facts demonstrating

> that the accounting practices were so deficient that the audit amounted to no

audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions.

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994) (citing *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992)), *cert. denied*, 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995). *See also, In re SmarTalk, supra* ("to allege that an independent accountant or auditor acted with scienter, the complaint must identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly.")

Plaintiffs' allegations of scienter on the part of PwC are that Kmart's annual financial statements were misstated and did not comply with GAAP and PwC must have either (a) known about the GAAP violations, or (b) recklessly conducted its audits in violation of GAAS, otherwise it would have known about the GAAP violations. These allegations of GAAP and GAAS violations are wholly conclusory and, as such, fail to provide the requisite "strong inference" of scienter necessary to state a 10(b) claim. As the court observed in *In re SmarTalk, supra*,

> The GAAS violations set forth in this case show nothing more than hindsight. At best, the Plaintiffs speculate that had PwC followed GAAS, PwC would have been aware of the GAAP violations. Again, absent from the allegations is any particular fact or document that would have come to light to show that a GAAP violation existed or at least make the existence of a GAAP violation so obvious that a reasonable person would have known of it.

124 F.Supp.2d at 517; *see also id.* at 518 ("At most, Plaintiffs' allegations amount to a speculative attempt to connect generally stated GAAS violations with information discovered after the fact, in an attempt to create the appearance of recklessness. This attempt fails.")

Furthermore, even if Plaintiffs had alleged PwC's actual knowledge of GAAP violations by Kmart, or even specific instances of GAAS violations by PwC, that still would not be sufficient. Courts have uniformly held that allegations of GAAP or GAAS violations, standing alone, are insufficient to establish scienter. *See, e.g., In re Comshare, supra,* 183 F.3d at 553; *In re SmarTalk,* 124 F.Supp.2d at 517. Nor is Plaintiffs' allegation that PwC received $13 million in fees from Kmart in 2000, of which only ten percent related to audit work, (Compl., ¶ 142), sufficient to establish scienter. *See e.g., Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1127–28 (7th Cir.1990), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991) (accountant's receipt of substantial fees for its services "not sufficient to support an inference of scienter"); *In re Ikon Solutions, Inc. Sec. Litig.,* 66 F.Supp.2d 622, 628 (E.D.Pa.1999) (allegation that accounting firm received more than $13 million in fees over 2–year period is insufficient to show motive to commit fraud).

Plaintiffs argue that PwC's scienter can be inferred from two statements in two of the anonymous financial department employee letters in Exhibit A stating that PwC was "hesitant to pursue the[ ] issues [raised by the letter writers] or even question obvious changes in revenue and expense patterns" and "had specific knowledge of [unspecified] unacceptable accounting practices." *See* 1/9/02 and 2/15/02 Letters. However, such vague, fact-deficient allegations are not sufficient to support a "strong inference" of PwC's scienter.

In sum, the Court finds that Plaintiffs have failed to sufficiently allege scienter on the part of Defendant Pricewaterhouse-Coopers.

### 4. *LOSS CAUSATION*

Plaintiffs in federal securities fraud cases have long been required to prove "loss causation," *i.e.,* that were it not for the defendant's wrongdoing, the plaintiff would not have incurred the harm alleged. *See e.g., Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 593 F.2d 736, 744 (6th Cir.1979); *See Campbell v. Shearson/American Exp. Inc.,* 829 F.2d 38, 1987 WL 44742 at *2 (6th Cir.1987) (unreported decision; text available on WESTLAW). The loss causation requirement, originally borrowed from the common law tort principle of causation,[23] was explicitly incorporated into the federal securities laws with the passage of the PSLRA in 1995. In pertinent part, the PSLRA provides:

(4) Loss Causation

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u–4(b)(4).

The legislative history of the PSLRA makes clear that this is a pleading requirement: "The Conference Committee also requires the plaintiff to *plead* and then prove that the misstatement or omission alleged in the complaint actually caused the loss incurred by the plaintiff in new Section 21D(b)(4) of the 1934 Act." H.R. Conf. Rep. No. 104–369 at 41 (1995), *re-*

---

**23.** *See Bastian v. Petren Resources Corp.,* 892 F.2d 680 (7th Cir.1990) (citing Prosser and Keeton on the Law of Torts § 110, at p. 767 (5th ed.1984)), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990).

*printed in* 1995 U.S.C.C.A.N. 730, 740 (emphasis added).

 Both prior to and after the passage of the PSLRA, courts have bifurcated the causation pleading requirement, and require that plaintiff allege facts establishing both "transaction causation" and "loss causation." *See Robbins v. Kroger Properties, Inc.,* 116 F.3d 1441, 1447 (11th cir. 1997); *Ambassador Hotel Co. v. Wei-Chuan Inv.,* 189 F.3d 1017, 1027 (9th Cir. 1999); *Suez Equity Investors, L.P v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2nd Cir.2001); *Semerenko v. Cendant,* 223 F.3d 165, 184–85 (3rd Cir.2000); *Campbell v. Shearson/American Exp. Inc., supra,* 1987 WL 44742 at *2.

"Transaction causation," another way of describing reliance, is established when the misrepresentations or omissions cause the plaintiff to engage in the transaction in question. *Robbins, supra.* As such, transaction causation is akin to "actual" or "but for" causation. *Id. See also, Ambassador Hotel, supra; New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc., supra,* 1999 WL 33295037 ("Transaction causation is simply another way of describing reliance.")

Transaction causation is not at issue here. The Corrected Amended Consolidated Complaint adequately pleads transaction causation by alleging that "Plaintiffs and the Class would not have purchased Kmart publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements." (Compl. ¶ 166; *See also* ¶ 155 "[P]urchasers of Kmart's securities... suffered ... injury through their purchase of Kmart's securities at artificially inflated prices and a presumption of reliance applies.")

To establish "loss causation," the plaintiff must show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Robbins, supra,* (quoting *Huddleston v. Herman & Mac-Lean,* 640 F.2d 534, 549 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

The Sixth Circuit explained the two-part transaction/loss causation requirement as follows:

Reliance [i.e., transaction loss] is a causa sine qua non, a type of 'but for' requirement: had the investor known the truth he would not have acted. Causation requires one further step in the analysis: even if the investor would not otherwise have acted, was the misrepresented fact a proximate cause of the loss? The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss. *The [loss] causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted. Absent the requirement of [loss] causation, Rule 10b–5 would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission.*

*Campbell v. Shearson/American Exp. Inc., supra,* 1987 WL 44742 at *2, (quoting *Huddleston v. Herman & MacLean, supra,* 640 F.2d at 549). *See also, Murray v. Hosp. Corp. of America,* 682 F.Supp. 343, 346 (M.D.Tenn.1988), *aff'd* 873 F.2d 972 (6th Cir.1989) ("The causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value.

If the investment decision is induced by misstatements... that were relied upon by the claimant but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted."); *Robbins, supra* ("In other words, loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss." 116 F.3d at 1447 (citation omitted)). *Accord, Bastian v. Petren Res. Corp., supra,* 892 F.2d at 685.

The Seventh Circuit warned about such a potential for virtually unlimited defendant liability for investor losses in *Bastian, supra.* In *Bastian,* the Seventh Circuit affirmed the district court's grant of the defendants' Rule 12(b)(6) motions where the plaintiffs had made no showing that their considerable losses were directly attributable to the defendants' alleged misrepresentations. The *Bastian* court explained its dismissal of the complaint for failure to allege facts establishing loss causation as follows:

> The plaintiffs alleged that they invested in the defendants' limited partnerships because of the defendants' misrepresentations, and that their investment was wiped out. But they suggest no reason why the investment was wiped out. They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one.... If the plaintiffs would have lost

their investment regardless of the fraud, any award of damages to them would be a windfall.... Defrauders are a bad lot and should be punished, but Rule 10b–5 does not make them insurers against national economic calamities. If the defendants' [investment] ventures failed not because of the personal shortcomings that the defendants concealed but because of industry-wide phenomena that destroyed all or most such ventures, then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages.

892 F.2d 680, 684–85.

■ Consistent with the above-cited cases, the majority view is that, although alleging that a security was artificially inflated may suffice to plead "transaction causation," "loss causation" requires the plaintiff to point to some causal link between the alleged misrepresentations and a concrete decline in the value of the plaintiff's stock. *See, e.g., Robbins, supra,* 116 F.3d at 1447; *Semerenko v. Cendant Corp., supra,* 223 F.3d at 185; *Huddleston, supra,* 640 F.2d at 549; *Bastian, supra,* 892 F.2d at 684–85; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 273 F.Supp.2d 351, 363–65 (S.D.N.Y.2003) (citing *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2nd Cir. 1994)).[24] The most common "causal link"

24. This two-part transaction/loss causation requirement is the rule in the Second, Third, Fourth, Fifth, Seventh and Eleventh Circuits. The Sixth Circuit has also adhered to this requirement albeit only in unpublished decisions. *See Campbell v. Shearson/American Express, supra; Murray v. Hospital Corp. of America, supra.* Although unpublished, the Court finds these decisions well-reasoned and adopts their reasoning.

Only the Eighth and the Ninth Circuits require only that a plaintiff allege that the stock price was artificially inflated on the date of

purchase. *See In re Control Data Corp. Sec. Litig.,* 933 F.2d 616, 619 (8th Cir.1991); *Broudo v. Dura Pharmaceuticals, Inc.,* 339 F.3d 933, 938 (9th Cir.2003). As a number of courts have noted in refusing to apply their standard, the Eighth and Ninth Circuits' rule conflates transaction and loss causation. *See e.g., Robbins v. Kroger Props., supra,* 116 F.3d at 1448:

> Our cases do not hold that proof that a plaintiff purchased securities at an artificially inflated price, without more, satisfies the loss causation requirement. Some courts have held that '[i]n a fraud-on-the-

pled under this rule is a showing that the plaintiff suffered an economic loss fairly attributable to the public airing of the alleged fraud, *i.e.*, a significant stock price decline immediately following the announcement that reveals the fraud to the public. *See, generally, Robbins, supra*, 116 F.3d at 1447.

Furthermore, loss causation cannot be found if an intervening cause was responsible for the plaintiff's economic loss. *See Unterberg Harris Private Equity Partners, L.P. v. Xerox Corp.*, 995 F.Supp. 437, 441 (S.D.N.Y.1998); *accord First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2nd Cir.1994) (loss causation not established because plaintiff did not plead facts to show that its loss was caused by defendants' alleged misstatements as opposed to intervening events); *Bastian, supra*, 892 F.2d at 684 (loss causation not established because defendants' misstatements were not the reason that the transaction "turned out to be a losing one.")

> market case, plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation.' *Knapp v. Ernst & Whitney*, 90 F.3d 1431, 1438 (9th Cir.1996). *See also In Re Control Data Corp. Securities Litigation*, 933 F.2d 616, 619–20 (8th Cir. 1991).... But the fraud on the market theory, as articulated by the Supreme Court, is used to support a rebuttable presumption of reliance, not a presumption of causation. *See Basic v. Levinson*, 485 U.S. 224, 241–2, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988).... Our cases have not utilized the theory to alter the loss causation requirement, and we refuse to do so here. *Id.*
>
> Furthermore, the minority view's price-inflation approach does not square with the PSLRA's requirement that a plaintiff plead and prove that "the act or omission of the defendant alleged to violate [Section 10b] caused the loss for which the plaintiff seeks to recover...." 15 U.S.C. § 78u–4(b)(4).
>
> **25.** Plaintiffs alternative loss causation argument, that the purported falsity of PwC's au-

Turning to the instant action, Plaintiffs here have not alleged in their Complaint the requisite "causal nexus" between the alleged misrepresentations of the Defendants and the economic harm they suffered as a direct result of the alleged fraud. Rather, Plaintiffs take the position that to allege loss causation, a plaintiff need only show that he or she purchased a stock at a price that was artificially inflated by Defendants' misrepresentations. *See* Plaintiffs' Memorandum of Law in Opposition to Pricewaterhouse-Coopers LLP's Motion to Dismiss the Consolidated Amended Complaint, pp. 20–21; *see also* Plaintiffs' Memorandum in Response to the Court's July 31, 2003 Order for Supplemental Briefing.[25] Such an allegation satisfies only the "transaction causation" prong of the causation requirement. As discussed above, a majority of the other Circuits (and the Sixth Circuit in unpublished decisions) have expressly held that this is not sufficient to allege loss causation under Section 10(b) and Rule 10b–5.[26]

> dit opinion was disclosed to the market when Kmart filed for bankruptcy is likewise without merit. Nowhere in Plaintiffs' Complaint (or any public filing, announcement, press release or other document referenced therein) is there any mention or suggestion that inaccuracies in Kmart's financial statements or PwC's audit opinions on those statements were disclosed upon the filing of the bankruptcy petition. Rather, all that they have alleged is that the company's bankruptcy was caused by Kmart's deteriorating financial condition. *See* Compl., ¶¶ 77–79.
>
> **26.** Nor have Plaintiffs pleaded facts to show that their losses were caused by defendants' alleged misstatements as opposed to intervening events. During the class period from March 13, 2001 until May 15, 2002, Kmart's share price declined from $9.09 to $1.17. *See* Table of daily Kmart stock prices *available at* http://table.finance.yahoo.com (copy attached as Exhibit B of Defendant Schwartz's Supplemental Brief.) (The Court may take judicial notice of well-publicized stock prices and market trends without converting a motion to

Having failed to adequately allege the requisite causal nexus between the alleged misrepresentations of the Defendants and Plaintiffs' economic losses, the Defendants' Motions to Dismiss will be granted with respect to Plaintiffs' Section 10b/10b–5 claim.

## C. *PLAINTIFFS SECTION 20(a) CLAIMS LIKEWISE MUST BE DISMISSED*

In the Second Claim of their Complaint, Plaintiffs allege that "by reason of their positions as officers and/or directors of Kmart, the Individual Defendants had the power and authority to cause Kmart to engage in the wrongful conduct complained of herein. Kmart controlled the Individual Defendants and all of its employees. By reason of such conduct, these defendants are liable pursuant to § 20(a) of the Exchange Act [15 U.S.C. § 78t(a).]" (Compl., ¶ 169).

Section 20(a) of the Securities and Exchange Act provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

██ To plead a Section 20(a) violation, a complaint must allege facts establishing that the defendant "controlled" another person who committed an underlying violation of the Act, *and* that the defendant "culpably participated" in that underlying violation. *In re Rospatch Sec. Litig.*, 760 F.Supp. 1239, 1248 (W.D.Mich.1991) (citing *Wool v. Tandem Computers, Inc., supra,* 818 F.2d at 1440) ("In order to plead control personal liability, the plaintiff must allege the defendant's power to influence the corporation, as well as culpable participation in the alleged fraud.")

██ It is axiomatic that in order to allege a *prima facie* claim of "controlling person" liability under Section 20(a), the plaintiff must first plead a primary violation of Section 10(b). Because as discussed above, Plaintiffs have failed to withstand dismissal of their § 10(b) claim, their Section 20(a) claim against these Defendants fail as a matter of law. *See Havenick v. Network Express, Inc.*, 981 F.Supp. 480, 522 (E.D.Mich.1997).

---

dismiss into a motion for summary judgment in a securities fraud case. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n. 8 (2nd Cir.2000); *In re First Union Corp. Sec. Litig., supra,* 128 F.Supp.2d at 883.) The Court further notes that the stock market, in general, was in a period of decline during this period and this general decline has been attributed to the events of September 11, 2001, recession and the war in Afghanistan. With respect to Kmart in particular, there was one other intervening event—Kmart's bankruptcy filing—to which market analysts have attributed the fall in Kmart stock prices. *See* Constance L. Hays, *THE MARKETS: Market*

*Place; Analyst Talks of Bankruptcy and Kmart Takes a Plunge*, N.Y. Times, January 3, 2002. It is noteworthy that, in contrast to the substantial decline in share price that occurred on or before January 22, 2002, the date of Kmart's bankruptcy filing—from $9.09 on March 13, 2001 to $0.70 on January 22, 2002, with a $1.04 overnight drop from $1.74 to $0.70 on the actual date of bankruptcy filing—Kmart stock dropped only $.05—from $1.22 to $1.17—on May 15, 2002, when the corrective disclosure was allegedly made. *See* Defendant Schwartz's Supplemental Ex. B.

D. *PLAINTIFFS' REQUEST FOR LEAVE TO AMEND WILL BE DENIED.*

 Fed.R.Civ.P. 15(a) provides that after a responsive pleading is filed, a party may amend his pleading "only by leave of court or by written consent of the adverse party, and leave shall be freely given when justice so requires." The party requesting leave to amend must "act with due diligence if it wants to take advantage of the Rule's liberality." *See Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 306 (6th Cir.2000), *cert. denied*, 533 U.S. 951, 121 S.Ct. 2594, 150 L.Ed.2d 752 (2001). Eastern District of Michigan Local Rule 15.1 further requires that a party seeking leave to amend a pleading provide the Court with a copy of its proposed amended pleading. Whether to grant leave to amend is a matter which rests in the discretion of the court. *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178 (6th Cir.1996).

 Turning to this case, Plaintiffs here have never filed a motion for leave to amend nor have they presented the Court with any proposed amendment of their claims. Rather, all that Plaintiffs here have done is to request, almost as an aside in their brief opposing Defendants' motions to dismiss, that "if the Court concludes that any aspect of plaintiffs' claims are inadequately pled... that they be granted leave to replead and cure any deficiencies identified by the Court." [*See* Plaintiffs' Brief in Opposition to the Individual Defendants' Motions to Dismiss, p. 54.] As the Court found in *Confederate Mem'l Ass'n v. Hines*, 995 F.2d 295 (D.C.Cir.1993), "[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought... does not constitute a motion within the contemplation of Rule 15(a)." *Id.* at 299.

The Sixth Circuit's disfavor of such a bare request in lieu of a properly filed motion for leave to amend was made clear in *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776 (6th Cir.2000), *cert. denied*, 531 U.S. 1145, 121 S.Ct. 1082, 148 L.Ed.2d 958 (2001): "What plaintiffs may have stated, almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is ... not a motion to amend." *Id.* at 784. As the *Begala* court stated in affirming the district court's dismissal the plaintiff's complaint with prejudice in that case,

> Had plaintiffs filed a motion to amend the complaint prior to th[e] Court's consideration of the motions to dismiss and accompanied that motion with a memorandum identifying the proposed amendments, the Court would have considered the motions to dismiss in light of the proposed amendments to the complaint.... Absent such a motion, however, Defendant was entitled to a review of the complaint as filed pursuant to Rule 12(b)(6). *Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.*

214 F.3d at 784 (emphasis in original). *See also, In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332–33 (3rd Cir.2002) (affirming dismissal of § 10b complaint with prejudice, noting that plaintiff proffered no additional allegations and only requested leave to amend in opposition brief).

 Even beyond Plaintiffs' failure to properly move for leave to amend, the Court finds that justice does not require that such leave be granted in this case. Plaintiffs here have already had three chances to state their allegations correctly. Their Corrected Consolidated Amended Complaint, which was filed on November 1, 2002, represents the third complaint they have filed in this action. Plaintiffs

filed their initial complaints (against Defendant Conaway, only) on February 21, 2002. Six months later, on August 15, 2002, Plaintiffs filed their "Consolidated Amended Complaint" which expanded the original complaint allegations and added Defendants Boyer, Schwartz, Hilzinger, Welch and PwC as party-defendants. Two and a half months later, on November 1, 2002, Plaintiffs, filed a second amended consolidated complaint, which they captioned as a "Corrected Consolidated Amended Complaint."

The Sixth Circuit has noted that denial of leave to amend may be appropriate where there has been "repeated failure to cure deficiencies by amendments previously allowed." *See Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir.2002) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Although in *Morse*, the appellate court vacated the district court's dismissal of the plaintiffs' Section 10b complaint, it did so only because it found that the plaintiffs did not have notice of the procedural rules the district court followed in approving a magistrate judge's report and recommendation and denying plaintiff's post-judgment motions.

The *Morse* plaintiffs had submitted a series of objections to the magistrate judge's R & R (which recommended dismissal of their complaint) and in their objections, plaintiffs requested "leave to re-plead, consistent with the recommendation (at 67) of the Report and Rule 15(a), Fed. R.Civ.P." The plaintiffs, however, did not tender a proposed second amended complaint with their objections.

The district court adopted the magistrate judge's report and recommendation, with modification, and dismissed the plaintiffs' complaint with prejudice. Thereafter, the plaintiffs moved to alter the judgment and sought leave to amend under Rule 15(a). The district court denied the motion explaining:

> The course of action the plaintiffs elected to follow was a strategic decision of their own choice. It appears to have had about it a bit of the cat and mouse, i.e., let the Court first sort out the deficiencies in the pleadings and after judgment then seek to amend to patch up the matter and then attempt to close the rat holes. The plaintiffs had every opportunity to amend during the pendency of this matter and must accept the consequences of the delay.

290 F.3d at 798 (quoting *Morse v. McWhorter*, No. 3–97–0370 (M.D.Tenn. October 5, 2002)).

The Court of Appeals, however, concluded that the plaintiffs did not have notice of the district court's requirement that a proposed amendment be submitted contemporaneously with objections to an R & R, and for this reason, the appellate court vacated the dismissal and remanded the case. 290 F.3d at 800. The court explained:

> Plaintiffs contend that they did not tender their proposed second amended complaint prior to judgment because they did not believe they were under an obligation to submit an amended complaint prior to district court review. Plaintiffs' contention appears correct: we are unable to find any provision in the Local Rules for the Middle District of Tennessee or the district judge's rules, or any decision of this court requiring plaintiffs to tender their proposed second amended complaint with their objections to the magistrate's report, instead of only requesting leave to amend. But without precedent notifying the plaintiffs that merely submitting objections to the magistrate's report was inadequate, we are unwilling to penalize the proposed class.

*Id.*

Therefore, the court vacated the dismissal and remanded the case to the dis-

trict court. In so doing, however, the Sixth Circuit specifically noted its agreement with the district court's unfavorable characterization of the plaintiffs' tactics and made clear that the district court's responsibilities do not include instructing experienced securities counsel how to plead an actionable complaint:

> As to the district court's characterization of plaintiffs' maneuvering, we share the district court's frustration with plaintiffs' apparent "cat and mouse" class action gamesmanship. And while *we agree that a district court's responsibilities do not include instructing ostensibly sophisticated securities class action counsel how to plead an actionable complaint,* without notice to plaintiffs' counsel, we cannot conclude they acted in bad faith in failing to amend their complaint at an earlier date.

*Id.*

While the Sixth Circuit may have viewed the *Morse* district court's ruling as too harsh given the lack of notice, that excuse is not available to Plaintiffs here.[27] Therefore, to the extent that Plaintiffs rely upon *Morse* in requesting that any dismissal be without prejudice and that they be allowed to replead their second amended consolidated complaint to cure the deficiencies found by the Court, that reliance is misplaced.

Plaintiffs here had nine months after filing their initial complaints to perfect their pleadings. Twice thereafter they filed amended complaints. As the court noted under similar circumstances in *In re Exabyte Corp. Sec. Litig.,* 823 F.Supp. 866 (D.Colo.1993),

After consolidation of the eight lawsuits comprising this litigation, Plaintiffs, represented by experienced and competent counsel, were given an adequate opportunity to file a new complaint setting forth their best theories in this case. That effort has failed. Given the high stakes in securities litigation, two bites at the apple are enough.

*Id.* at 873.

Plaintiffs here have already had *three* bites at the apple. Furthermore, as indicated above, the PSLRA explicitly mandates dismissal of complaints that do not meet the Reform Act's pleading requisites. *See* 15 U.S.C. § 78u–4(b)(3) ("[T]he court shall on the motion of any defendant dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." (Emphasis added).) As Judge Feikens explained in dismissing the plaintiff's complaint with prejudice in *In re Champion Enterprises, Inc. Sec. Litig.,* 145 F.Supp.2d 871 (E.D.Mich.2001):

> The plain language of the Reform Act does not contemplate amending complaints; it does set a high standard of pleading which if not met results in a mandatory dismissal. The necessary goal of this plain, and strong language, is that it should be dismissed with prejudice. To conclude otherwise would be to abrogate the very purpose of the legislation.

*Id.* at 873.

The "purpose" of the PSLRA, as noted by the *Champion* court is to "screen out lawsuits that have no factual basis" and to

---

**27.** Not only did Plaintiffs have notice of the requirement that a party moving to amend a complaint must submit to the Court a copy of the proposed amended complaint, as that requirement is embodied in the local court rules of this court (L.R.15.1) but more importantly, Plaintiffs' lead counsel in this case were also lead counsel in *Morse,* and therefore, had actual notice of the Sixth Circuit's disfavor of the very tactics they have employed here—i.e., not formally moving to dismiss and, instead, merely requesting as an aside in their brief opposing Defendants' motions to dismiss that in the event that the Court grant Defendants' motion that they be permitted to replead to cure the deficiencies pointed out by the Court.

"encourage attorneys to use greater care in drafting their complaints." *Id. See also Weber v. Contempo Colours, Inc.*, 105 F.Supp.2d 769, 771 (W.D.Mich.2000) (noting that the PSLRA was "passed to prevent 'strike suits'" and that the requirement of particularity in pleading seeks to accomplish this goal).

As set forth above, Plaintiffs have failed to plead their Section 10(b) claims against Defendants Conaway, Boyer, Schwartz, Hilzinger, Welch and PwC in conformity with the requirements of the PSLRA. Therefore, pursuant to Section 78u–4(b)(3), Plaintiffs request for leave to amend will be denied and Plaintiffs' complaint—which has been previously twice amended—will be dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs' Corrected Consolidated Amended Complaint fails to satisfy the pleading requirements of the PSLRA and Fed. R. Civ. Pro. 9(b) and, therefore, as expressly required under 15 U.S.C. § 78u–4(b)(3), this action must be dismissed, with prejudice. The Court makes no finding as to the substantive merits of Plaintiffs' allegations and its dismissal of Plaintiffs' Complaint by no means should be construed as giving Defendants a completely clean bill of health. The Court's dismissal of this action is based strictly on technical pleading requirements imposed by Congress, the wisdom of which is not for this Court to decide.[28] Further, this is a dismissal only of Plaintiffs' claims for violation of Section 10(b)/Rule 10b–5 and Section 20 of the Securities and Ex-

change Act of 1934. Plaintiffs may very well have a viable cause of action under state law, such as a common law fraud action, or even for violation of another federal law. Plaintiffs, however, did not plead any additional or alternative causes of action in their any of their Complaints before this Court.

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motions to Dismiss be, and hereby are, GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' request for leave to amend is denied and their Corrected Consolidated Amended Complaint is DISMISSED, with prejudice.

## JUDGMENT

The Court having this date entered and Opinion and Order granting Defendants' Motions to Dismiss and dismissing Plaintiffs' Corrected Consolidated Amended Complaint with prejudice, and being otherwise fully advised in the premises,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a JUDGMENT of DISMISSAL, WITH PREJUDICE be, and hereby is, entered.

---

28. Indeed, while the court recognizes the laudable objectives Congress sought to achieve in enacting the PSLRA's heightened pleading standards to require greater specificity and particularity—namely, to weed out costly and frivolous "fishing-expedition" lawsuits—the Court is concerned that given the certification requirements (and concomitant sanctions) imposed by Fed.R.Civ.P. 11 that factual allegations have, or are likely to have, evidentiary support, Congress may have set a virtually unreachable, or at least unrealistic, pleading standard in private securities fraud cases. However, this is a legislative judgment, and it is not for courts to abrogate or amend it by judicial fiat.